**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| J.M., on behalf of L.M., a minor child, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No:1:21-cv-55 |
| | ) | |
| ZIONSVILLE COMMUNITY SCHOOLS, ZIONSVILLE COMMUNITY SCHOOLS BOARD OF TRUSTEES, and individuals SCOTT ROBISON, REBECCA COFFMAN, SEAN CONNER, BLAIR WILLIAMS, and TERRY ROWE in their official and individual capacities, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff Jane Doe, by and through her attorneys MICHELLE K. MCGUIRE and CATHERINE M. MICHAEL, and hereby file the following Complaint against Defendants as captioned above.

## INTRODUCTION

1. At all relevant times detailed in this complaint, Jane Doe was a student at Zionsville Middle School ("ZMS") in Zionsville Community Schools.

2. During the course of her four years at ZMS, Jane Doe was subject to repeated sexual assault, bullying, and sex-based discrimination and harassment by other ZMS students.

3. Despite being repeatedly notified of the sexual assault, bullying, discrimination, and harassment, Zionsville Community Schools and its employees failed to take any appropriate action to address the situation. This included failing to meet with Jane Doe's

parents despite their repeated attempts to discuss the situation and failing to conduct an investigation of Jane Doe's claims.

4.     The failure to conduct an investigation violated both basic due process requirements and Title IX report response requirements as outlined in guidance from the U.S. Department of Education, Office for Civil Rights.

5.     Due to Zionsville Community Schools' failure to appropriately address the repeated sexual assaults, bullying, and harassment Jane Doe experienced at school over the course of the past three years, Jane Doe suffered severe emotional distress and has had to change schools and seek counseling and therapeutic treatment, has become withdrawn and anxious, and has been unable to participate in her normal social and educational activities.

## JURISDICTION AND VENUE

6.     This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, et seq.

7.     This is also an action to redress the deprivation of Plaintiff's constitutional rights under the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. §1983.

8.     Subject matter jurisdiction is based on 28 U.S.C. §1331, which grants district courts jurisdiction over all civil actions arising under the Constitution, laws and treaties of the United States.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action

to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

9.    Plaintiff's claims are cognizable under the United States Constitution, 42 U.S.C. §1983, and Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681.

10.   The events giving rise to this lawsuit occurred in Boone County, Indiana, which sits in the Indianapolis Division of the Southern District of Indiana.

11.   Venue is proper in the United States District Court for the Southern District of Indiana, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

## PARTIES

12.   At all relevant times, Plaintiff Jane Doe was a resident of Boone County, Indiana and a student attending Zionsville Public Schools.

13.   Defendant Zionsville Community Schools ("ZCS") was at all relevant times and continues to be a public educational institution, a public education system located in Zionsville, Indiana, County of Boone, with its principal place of business at 900 Mulberry Street, Zionsville, Indiana 46077.

14.   Zionsville Community Schools Board of Trustees ("Board of Trustees") is the governing body of Zionsville Community Schools.

15.   Defendant ZCS receives federal funding and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681(a).

16.   ZCS and the Board of Trustees shall be collectively referred to as "the ZCS defendants."

17.   At all material times, Defendant Scott Robison ("Robison") was an agent and/or employee of ZCS, acting or failing to act within the scope, course, and authority of his

employment and his employer.

18.    At all material times, Robinson was the superintendent of ZCS.

19.    At all material times, Defendant Rebecca Coffman ("Coffman"), in her official capacity,
       was an agent and/or employee of ZCS, acting or failing to act within the scope, course, and
       authority of her employment and her employer.

20.    At all material times, Coffman was the Title IX coordinator for ZCS.

21.    At all material times, Defendant Sean Conner ("Conner") was an agent and/or employee
       of ZCS, acting or failing to act within the scope, course, and authority of his employment
       and his employer

22.    At all material times, Conner was the principal of ZMS.

23.    At all material times, Defendant Blair Williams ("Williams") was an agent and/or
       employee of ZCS, acting or failing to act within the scope, course, and authority of her
       employment and her employer.

24.    At all material times, Williams was the assistant principal of ZMS.

25.    At all material times, Defendant Terry Rowe ("Rowe") was an agent and/or employee of
       ZCS, acting or failing to act within the scope, course, and authority of her employment and
       her employer.

26.    At all material times, Rowe was a teacher at ZMS.

## APPLICABLE LAW AND POLICY

*TITLE IX*

27.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 (a), states
       that:

              No person in the United States shall, on the basis of sex, be excluded from
              participation in, be denied the benefit of, or be subjected to discrimination

4

under any education program or activity receiving federal financial assistance…

28.    Title IX is implemented through the Code of Federal Regulations.  See 34 C.F.R. Part 106.

29.    34 C.F.R. § 106.8 (b) provides:

> A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

30.    In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

31.    In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the United States Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student, rather than a teacher.

32.    *Davis* held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is:

> a) deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and
> b) the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school. *Davis*, 526 U.S. at 1669-76.

33.    Title IX and its interpretive regulations also prohibit retaliation against any person who complains about what they reasonably believe to be a Title IX violation, advocates on behalf of Title IX rights and enforcement, or cooperates in any investigation of a Title IX violation.

*42 U.S.C. § 1983*

34.    The Fourteenth Amendment to the United States Constitution provides in pertinent part

that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

35. Municipal bodies are liable for constitutional violations under 42 U.S.C. § 1983 when execution of its official policy or custom deprives an individual of its rights protected under the Constitution. *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658 (1978).

36. Such municipal liability exists where a government entity fails to properly train, supervise, and discipline its employees amounting in a deliberate indifference to one's constitutional rights. *See City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989); *Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir. 1985); *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983).

## FACTUAL ALLEGATIONS

37. On approximately November 27, 2017, Jane Doe was bullied for the first of many times during her fifth-grade gym class.

38. A male classmate pushed her, kicked her, called her names, threw a ball in her face, and got the other boys to call her a "witch."

39. Jane Doe reported the incident to her gym teacher Andy Maguire, but no action was taken by the teacher or by ZCS.

40. Three days later, on approximately November 30, 2017, another boy called Jane Doe a "witch" while passing by her in the hallway.

41. Jane Doe was embarrassed and could not understand why the kids were being so mean to her. She dreaded going to school because she was afraid she was going to get picked on.

42. This bullying and harassment continued when Jane Doe started sixth grade in fall semester 2018.

43. In August of 2018, Jane Doe was bullied by her classmates, called names, and left without

a partner.

44.  Upon information and belief, ZMS Counselors Carrie Nonte and Jessica Yates created a plan to allow Jane Doe to eat lunch with them in order to give her a safe space.

45.  However, Jane Doe's bullies were allowed to stay at Jane Doe's lunch table and were not removed by ZMS staff.

46.  The school's plan forced Jane Doe to modify her lunch schedule around the bullies rather than disciplining and addressing the bullies directly.

47.  Discouraged with the school's lack of response to Jane Doe's bullying and worried about her daughter's well-being, Jennifer Miller wrote a letter to WTHR, a news channel in Indiana, about her daughter's experiences with bullying and harassment at ZMS on August 15, 2018.

48.  WTHR responded and expressed their interest in coming to ZMS to support Jane Doe at lunch with letters and gifts.

49.  However, the impact of this show of support was diminished when Nonte informed Ms. Miller that the celebration would have to be in a private conference room.

50.  On or about September 20, 2018, the women from WTHR held a celebration for Jane Doe's birthday in a private conference room at ZMS rather than the cafeteria.

51.  In October of 2018, there was an outpouring of support for Jane Doe from female students on the high school cheerleading and soccer teams.

52.  High school cheerleaders and college students from the University of Kentucky wrote letters of encouragement for Jane Doe.

53.  On October 23, 2018, the head coach of the high school soccer team emailed Principal Conner to ask if the girls from the soccer team could eat lunch with Jane Doe at the middle

school in order to support her and serve as role models for her.

54.   Upon information and belief, Principal Conner did not allow the high school girls to come to lunch and support Jane Doe.

55.   Despite the outpouring of support Jane Doe was receiving, the worst of the bullying and harassment was yet to come.

56.   On or around January 13, 2019, one of Jane Doe's classmates, "John Roe,"[1] began sending Jane Doe inappropriate and sexually explicit messages and photographs via social media.

57.   On or around that same day, John Roe repeatedly asked Jane Doe for nude photographs of herself over SnapChat.

58.   After Jane Doe refused to send him nudes, John Roe then sent her a picture of himself shirtless, then two pictures of his erect penis.

59.   On January 31, 2019, John Roe sent Jane Doe a picture of his genitals through Snapchat.

60.   Jane Doe screenshotted the picture and showed it to her mother and father.

61.   After receiving these unsolicited pictures, Jane Doe blocked John Roe.

62.   Jane Doe felt violated and disgusted that one of her classmates would send her such inappropriate pictures unprovoked and was embarrassed about seeing him at school after that.

63.   While Ms. Miller tried to figure out who to report the image to, John Roe escalated his harassment by groping Jane Doe's buttocks at school.

64.   On or around March 12, 2019, Jane Doe was at school walking to the library when John Roe came up behind her and slapped her buttocks without her consent.

65.   Jane Doe thought it was an accident, until John Roe kept asking her if he could "touch her

---

[1] John Roe is a pseudonym.

ass."

66.   Jane Doe told John Roe he could not touch her and told him to stop.

67.   Jane Doe was afraid that John Roe's harassment was escalating and became more fearful of seeing him at school.

68.   The next day, on or around March 13, 2019, John Roe touched Jane Doe's buttocks twice without her consent.

69.   On or around March 14, 2019, John Doe touched Jane Doe's buttocks approximately four times without her consent.

70.   Both of these incidents occurred in teacher Ben Cole's classroom.

71.   Jane Doe kept telling John Roe "no" and that he could not keep touching her, but John Roe continued to touch her anyway.

72.   On March 19, 2019, Mr. Cole was absent, and a substitute teacher taught his class.

73.   John Roe repeatedly followed Jane Doe around class, saying, "You know this is what you want" (referring to his penis), "This is turning you on," and other inappropriate, unwelcome sexual advances.

74.   John Roe scared Jane Doe into thinking that she couldn't leave the classroom by taunting her that the substitute teacher would not believe her and would not help her.

75.   John Roe then started groping Jane Doe's buttocks and vulva with his hand.

76.   Jane Doe was able to set up her phone and capture a video of John Roe assaulting her.

77.   When Jane Doe's parents picked her up after school, Jane Doe was visibly shaken, hysterical, and scared as she told her parents what John Doe had done to her.

78.   Once the family got home, Jane Does' parents called their neighbors, a retired Zionsville teacher and former police officer, who urged them to report the incident to the police.

79.  On March 19, 2019, the same day John Roe groped Jane Doe, Ms. Miller called the Zionsville Police Department to report the assault.

80.  Ms. Miller first spoke with Officer Joseph Dennemann and told him about the groping incident that happened that day.

81.  Ms. Miller also told Officer Dennemann that Jane Doe had heard John Roe say that he wanted a gun, was going to shoot up the Zionsville Middle School, and then was going to kill himself.

82.  That same night, after speaking with Officer Dennemann on the phone, Ms. Miller took Jane Doe to the police station.

83.  Ms. Miller told Officer Dennemann that John Roe had been harassing and stalking Jane Doe since January by sending Jane Doe inappropriate and unwelcome messages and photographs of his erect penis.

84.  Ms. Miller showed screenshots of the messages and photographs from John Roe to Officer Dennemann, along with the video Jane Doe took of John Roe groping her in class.

85.  On March 23, 2019, Jane Doe and her parents went to ZMS and reported John Roe's assault of Jane Doe to Vice Principal Blair Williams and counselors Nonte and Yates.

86.  The Millers also informed Williams and the counselors that they had reported this matter to the police.

87.  Williams told Jane Doe's parents that John Roe would be switched to a different classroom to separate him from Jane Doe and he would not be in school for a few days.

88.  Williams and the counselors also told Jane Doe that if she was ever scared or harassed, she should immediately tell her teacher she needed to go to the counselor's office.

89.  Williams and the counselors even told Jane Doe and her parents that it was part of Jane

Doe's Individualized Education Plan ("IEP")[2] that she could be excused from class.

90.  The Millers told Williams, Nonte, and Yates that they had gone to the police the night before.

91.  Williams and the counselors made no mention of whether the school would initiate a Title IX investigation.

92.  No ZCS staff provided Jane Doe or her parents with any information about her rights under Title IX, the identity of the ZCS Title IX coordinator, or what ZCS policies were with respect to sexual misconduct.

93.  On March 22, 2019, Jane Doe was interviewed by the Sylvia's Child Advocacy Center as part of the criminal investigation.

94.  Jane Doe again recounted the incidents of sexual harassment, assault, and stalking that John Roe had perpetrated against her starting in January 2019 and going through March 2019.

95.  On March 23, 2019, three days after Jane Doe reported her repeated sexual assaults, harassment, and stalking to school officials, her classmates began retaliating against her for reporting by calling her a "snitch" in the hallway.

96.  John Roe's friends also asked Jane Doe why she would spread lies about John Roe.

97.  Other ZMS students would laugh and point at Jane Doe in the hallway

98.  Once John Roe was back in school approximately five days later, he would stare at Jane Doe menacingly whenever she saw him in the hallway.

99.  Jane Doe was mortified by John Roe's menacing stares and the continuous retaliation she faced from his friends.

100.  Once John Roe's friend started retaliating against her and John Roe returned to school Jane

---

[2] An IEP is a document providing individualized supports and services to students identified with disabilities under the Individuals with Disabilities in Education Act ("IDEA").

Doe missed a substantial amount of school because she was afraid and embarrassed to face her classmates.

101.    ZCS staff took no action to separate Jane Doe from her assailant.

102.    No Title IX investigation was initiated by ZCS.

103.    No interim measures were offered to Jane Doe.

104.    The harassment Jane Doe experienced at ZMS reared its ugly head once more during the following school year.

105.    On December 17, 2019, S.B.,[3] a new girl at school who, upon information and belief, had heard negative rumors about Jane Doe from John Roe's friends, started becoming aggressive towards Jane Doe.

106.    During art class, S.B. called Jane Doe names like "bitch" and "ho," mouthed "fuck you" to her, and spread a false rumor that Jane Doe had "raped" her younger brother and "made out with" him in a closet.

107.    Around this time, S.B. also put paint on Jane Doe's hand and told her that she was going to pour it all over her.

108.    Neither the art teacher nor any other ZCS staff did anything to intervene.

109.    Jane Doe was shocked over S.B.'s actions and afraid that she now had another bully to contend with at ZMS.

110.    When Jane Doe came home from school, she told her mother about S.B.'s attacks, sexual harassment, and defamation of her in art class.

111.    Ms. Miller immediately emailed Nonte to report the incident and expressed her frustration with the continued sexual harassment and bullying Jane Doe was facing at ZMS.

_____

[3] S.B. is a pseudonym.

112.   Mr. Miller also called Williams on December 20, 2020 to discuss the art class incident.

113.   Williams told Mr. Miller that she thought "everything was okay" and that "hopefully things would calm down" after the students returned from holiday break in January.

114.   No ZCS staff took any steps to protect Jane Doe, to advise her of her parents of her rights under Title IX, or to investigate the continued sexual harassment and bullying.

115.   On December 20, 2020, the retaliation against Jane Doe escalated when a group of students relentlessly bullied her during a class taught by Terry Rowe, who was Jane Doe's favorite teacher at the time.

116.   Rowe, like John Roe's father, was also employed by Zionsville Community Schools as a sports coach.

117.   Students called Jane Doe "weird" and a "liar" all throughout Mr. Rowe's class that day.

118.   Upon information and belief, these statements were made to retaliate against Jane Doe for reporting John Roe.

119.   Jane Doe attempted to protect herself from the harassment by asking Rowe if she could be excused from class, which Williams and the counselors told her she could do whenever she was being bullied.

120.   Rowe refused to excuse Jane Doe and told her to go back to her seat, even though Jane Doe told him that it was in her IEP that she could go to the counselor's office.

121.   Jane Doe felt extremely helpless and hurt that one of her favorite and most trusted teachers refused to offer any support while she was being bullied in plain sight.

122.   Since she was unable to leave, Jane Doe went back to her seat.

123.   S.B. and her friends continued to bully Jane Doe by taunting her and calling her names.

124.   After this incident, Jane Doe dreaded going to Rowe's class and did not want to participate

for fear of being bullied.

125.   Again, Jane Doe recorded the incident with her phone so she would have evidence of her classmates' bullying and harassment.

126.   When Jane Doe showed the video to her parents, they were not only appalled by how cruel Jane Doe's classmates were to her, but that they could hear Rowe in the background.

127.   Given Rowe's proximity to the situation, it would have been nearly impossible for him not to see and hear Jane Doe being harassed.

128.   The Millers brought up this incident to ZCS officials, but they were never provided any information about whether Rowe's refusal to comply with Jane Doe's IEP and his allowing the ongoing bullying against her was addressed by ZCS.

129.   On January 1, 2020, Ms. Miller emailed Superintendent Scott Robison, Conner, Williams, Nonte, Yates, and Rowe.

130.   Ms. Miller described all the assaults, harassment, stalking, and bullying that Jane Doe had endured at ZCS and how the district's failure to adequately address it left her family with no choice but to remove Jane Doe from school.

131.   Williams and the counselors responded that they were sorry to hear that and they were going to miss Jane Doe.

132.   Robinson and Conner never responded.

133.   Yet again, no information was provided to the family about their rights under Title IX, no interim measures were offered, and no investigation was initiated.

134.   Jane Doe's parents were eager to remove Jane Doe from the hostile environment at ZCS and took her to shadow two private schools on January 7 and 22, 2020 respectively.

135.   However, the family soon realized that the cost of private schools in the area was not within

their budget.

136.    Jane Doe also felt that the schools she shadowed were not a good fit, and she wanted to return to ZCS because she did not want to start somewhere new when she had not done anything wrong.

137.    When Jane Doe shadowed one of the schools, a student told her that S.B. had previously attended that same school but was kicked out for being a bully.

138.    After realizing that they could not afford the tuition and would have to move in order to send Jane Doe to another school, Mr. and Mrs. Miller decided that they could not remove Jane Doe from ZMS.

139.    On January 16, 2020, S.B. dumped a bucket in trash over Jane Doe's head in the hallway at school.

140.    Jane Doe was extremely humiliated and did not know how to react, she just stood in the hallway while people stared at her.

141.    Jane Doe told her mother about the incident, and Ms. Miller then reached out to Williams that day to report the incident.

142.    Williams called Jane Doe's parents later that day after reviewing the incident, which was caught on film.

143.    Williams again said she believed "things had settled down."

144.    Upon information and belief, the only disciplinary action taken against S.B. by ZCS was a one-day suspension.

145.    On January 21, 2020, Ms. Miller found out that S.B.'s sister was harassing Jane Doe over text by repeating S.B.'s lies that Jane Doe had "raped" her younger brother and "made out with" him in a closet.

146.   Ms. Miller emailed Williams that same day and told her that S.B.'s sister was now harassing Jane Doe.

147.   Ms. Miller did not receive a response from Williams until she happened to run into Williams on January 30, 2020, while she was at school to discuss the results of Jane Doe's dyslexia test.

148.   When Ms. Miller ran into Williams, Williams asked Ms. Miller if she could talk to her about the bullying right then.

149.   Ms. Miller was not expecting to have that conversation at that moment and wanted her husband to be present, but agreed to sit with Williams for a moment.

150.   Williams told Ms. Miller that her "heart broke" for Jane Doe and that the Miller family should tell Williams if S.B. or any of her family members harassed Jane Doe.

151.   Williams also told Ms. Miller that she took the filmed trash incident "very seriously" and that she would not only show S.B.'s parents the footage, but that S.B. would have "a file that would follow her throughout school."

152.   Williams also mentioned that S.B. has a history and the school would not let it continue, which seemed to align with the story Jane Doe heard about S.B. getting kicked out of her previous school for bullying.

153.   Besides the initial meeting to report John Roe's sexual assault and harassment of Jane Doe almost a year prior, and despite the continuous harassment, bullying, and retaliation Jane Doe faced, this impromptu meeting one of the only times either of Jane Doe's parents were able to meet face-to-face with anyone from ZCS.

154.   On February 14, 2020, the Millers received a letter from the state prosecutor regarding the criminal case against John Roe.

155. The admission hearing was rescheduled multiple times and finally set for June 25, 2020, where John Roe admitted guilt for his actions against Jane Doe.

156. During the hearing, Ms. Miller read Jane Doe's victim statement which detailed how traumatized she was by John Roe's sexual harassment.

157. The judge scolded John Roe by telling him that he was "so lucky to get off this easy" and that he had better learn to "never treat someone like that again."

158. John Doe was charged with sexual assault and harassment, and was found guilty beyond a reasonable doubt.

159. John Roe was sentenced to community service and was ordered to write an apology letter to Jane Doe, which the Millers did not receive until months later and had good reason to suspect that his attorney wrote it for him.

160. Even after John Roe was found guilty and sentenced in the criminal matter, ZCS still took no action to investigate or discipline John Roe for his repeated sexual assaults, harassment, bullying, and stalking of Jane Doe.

161. In October 2020, Jane Doe told Ms. Miller that John Roe was still sending inappropriate pictures to other young girls over SnapChat.

162. Jane Doe was upset that John Roe was still sexually harassing other girls and had not faced any significant consequences from ZMS.

163. At no point did ZCS Title IX Coordinator Rebecca Coffman ever reach out to the family, initiate any investigation, offer any interim measures, or take any other action required of her under federal law and guidance.

164. As a direct and indirect result of Defendants' actions and inactions, Jane Doe has suffered severe emotional and physical distress. She suffers from migraines, anxiety, social anxiety,

and depression and had to up her prescription due to the bullying and harassment she faced. Jane Doe also has trust issues due to the countless times ZCS officials that she thought she could trust let her down. Instead of enjoying her time as a student in middle school, Jane Doe often finds herself crying in the bathroom, terrified of being groped or raped, and wishing she was safe at home with her parents. Watching the trauma their daughter has endured has also caused a great deal of emotional distress for Jane Doe's parents. They looked into family counseling to not only help Jane Doe but also the rest of the family who has suffered from this experience, but at this time it is not financially feasible for them.

**COUNT I**
**Failure to Comply with Title IX**
**20 U.S.C. § 1681, *et seq.***
**(The ZCS Defendants)**

165.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

166.   The policies and practices of the ZCS Defendants are in clear contradiction to guidance issued by the U.S. Department of Education, Office for Civil Rights, due to the following:

   a.   ZCS failed to notify Plaintiff or to widely distribute information identifying its Title IX coordinator in violation of federal Title IX guidelines;

   b.   ZCS did not do any assessment to determine whether there was a hostile environment at ZMS;

   c.   ZCS did not complete any investigation into the allegations of sexual assault, sexual harassment, and stalking  harassment in violation of federal Title IX and Clery Act guidelines;

   d.   ZCS did not implement or even offer appropriate interim measures to Plaintiff to protect her from further harassment and retaliation;

18

e.   ZCS did not at any time advise Plaintiff or her parents of their right to file a Title IX complaint with either ZCS or the U.S. Department of Education, Office for Civil Rights; and

f.   ZCS did not take sufficient steps to end the harassment or remedy its effects on Plaintiff.

167.   This pattern and practice of behavior constitutes disparate treatment of female students and has a disparate impact on female students.

168.   The ZCS Defendants' failures constitute a per se violation of Title IX and left Plaintiff vulnerable to further harassment and assault that caused Plaintiff to forgo classroom instruction and extracurricular activities thereby limiting her ability to participate in, and benefit from, ZCS's educational programs and activities.

169.   As a direct and proximate result of the ZCS Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

**COUNT II**
**The District's Deliberate Indifference to Sexual Harassment**
**20 U.S.C. § 1681, *et seq.***
**(The ZCS Defendants)**

170.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

171.   Beginning in 2017 through 2020, Plaintiff was repeatedly subjected to sex-based harassment, including sexual assault, name-calling, and stalking by other ZCS students as articulated in Plaintiff's common allegations.

172.   This harassment was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational benefits provided by the ZCS Defendants.

173.   The ZCS Defendants created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C § 1681 (a) ("Title IX"), because:

   a.   Plaintiff was a member of a protected class;

   b.   She was subjected to sexual harassment in the form of sexual assault, unwelcome and demeaning sexual comments and name calling, stalking, and retaliation, all perpetrated by other ZCS students;

   c.   The harassment was based on her sex; and

   d.   She was subjected to a hostile educational environment created by the ZCS Defendants' lack of effective and appropriate policies and procedures to properly prevent, investigate, and address the sexual assault, sexual harassment, stalking, and retaliation.

174.   The ZCS Defendants had actual knowledge of the harassment, which was created by and furthered by the ZCS Defendants' repeated failure to protect Plaintiff consistent with its own policies and federal law and guidance.

175.   The ZCS Defendants' repeated failure to promptly and appropriately respond to the sexual assault, sexual harassment, stalking, and retaliation resulted in Plaintiff, on the basis of her sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in the ZMS Defendants' education program in violation of Title IX.

176.    The ZCS Defendants failed to take immediate, effective remedial steps to resolve the complaints of sexual assault, sexual harassment, and stalking, and instead acted with deliberate indifference toward Plaintiff.

177.    To date, the ZCS Defendants still have not initiated a Title IX investigation regarding the harassment and abuse suffered by Plainitff.

178.    The ZCS Defendants persisted in their actions and inactions even after they had actual knowledge of the harm suffered by Plaintiff.

179.    The ZCS Defendants engaged in a pattern and practice of behavior designed to discourage and dissuade students who had experienced Title IX violations from seeking assistance and protection.

180.    The ZCS Defendants actions and inactions after receiving reports of Title IX violations committed against Plaintiff by John Roe directly resulted in Plaintiff suffering additional incidents of sexual harassment, assault, and stalking perpetrated by John Roe and other ZCS students.

181.    Given the known circumstances, the ZCS Defendants' conduct in response constitutes deliberate indifference to student-on-student sexual harassment, in violation of 20 U.S.C. § 1681 *et seq*.

182.    The ZCS Defendants' failures caused Plaintiff to forgo classroom instruction and extracurricular activities thereby limiting her ability to participate in, and benefit from, the ZCS Defendants' educational programs and activities.

183.    As a direct and proximate result of the ZCS Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety,

mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

**COUNT III**
**1983 Violation**
**42 U.S.C. § 1983, the Fifth Amendment, and the Fourteenth Amendment**
**(Defendants Robinson, Coffman, Conner, and Williams)**

184.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

185.   Under the Fourteenth Amendment, Jane Doe had the right as a public-school student to personal security and bodily integrity, property interest in her education, and equal protection under the law.

186.   Defendants acted in their individual capacities and were state actors acting under the color of state law.

187.   Defendants each subjected Jane Doe to violations of her rights to personal security, bodily integrity, property interest in her education, and equal protection under the law without due process of law, in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution, by:

    a.   Failing to take steps to protect Jane Doe as necessary;

    b.   Treating Jane Doe with deliberate indifference; and

    c.   Failing to take steps to properly investigate the multiple reports made by Jane Doe and her parents of the sexual assault, sexual harassment, stalking, and bullying she experienced at the hands of other students.

188.   Defendants, in their individual capacities and under color of law, subjected Plaintiff to violations of her liberty interests in personal security and bodily integrity, her property interest in her education, and her right to equal protection under the law by failing to

appropriately discipline her perpetrators and by failing to adequately train and supervise their staff with respect to the handling of Title IX and bullying complaints.

189.     As a direct and proximate result of the Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

<u>**COUNT IV**</u>
***Monell* Liability for Failure to Train and Supervise**
**as to Response to Bullying, Sexual Assault,**
**Sexual Harassment, and Stalking**
**42 U.S.C. § 1983**
**(Defendants Board of Trustees, Robinson, and Conner)**

190.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

191.     At all times relevant, Defendants Board of Trustees, Robinson, and Conner had a duty to properly train, supervise, and discipline their employees and agents.

192.     Defendants breached that duty, in part, by:

a.   Improperly training, authorizing, encouraging, or directing ZCS staff regarding their obligations under Title IX, Indiana state law regarding bullying,[4] and district policy;

b.   Failing to properly investigate Plaintiff's claims; and

c.   Failing to discipline staff for violations of Title IX, Indiana state law, and district policy.

_____

[4] I.C. 20-33-8.

193. Defendants' conduct and omissions constitute deliberate indifference to Plaintiff's constitutional rights.

194. This unconstitutional behavior is carried out pursuant to a policy, pattern of practice, or custom, whether formal or informal, which violates the constitutional rights of persons situated such as Plaintiff.

195. Defendants are or were at the time of the events within policymakers for the purpose of implementing ZCS' unconstitutional policies and customs.

196. Defendants failed to take sufficient remedial actions to end this policy, pattern of practice, or custom prior to the harm caused to Plaintiff.

197. The policy of a failure to train and supervise, and the failure to end this policy, pattern of practice, or custom was a proximate cause to the injuries suffered by Plaintiff.

198. As a direct and proximate result of the Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## COUNT V
### Negligence
**(Defendants Robinson, Conner, Williams, and Rowe)**

199. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

200. Defendants Robinson, Conner, and Williams owed Plaintiff a duty of ordinary care to ensure her safety and freedom from bullying, sexual harassment, sexual assault, and

stalking while a student at ZCS and a duty of ordinary care to conduct investigations of her claims in compliance with ZCS's own policies and basic industry standards.

201.   Defendants Robinson, Conner, and Williams' failure to investigate, find responsible, or sufficiently discipline any of the perpetrators identified in this complaint breached their duty of care.

202.   Defendants Robinson, Conner, and Williams' failure to follow their own policies in reviewing, investigating, and resolving Plaintiff's complaints of bullying and Title IX violations breached their duty of care.

203.   Defendant Rowe owed Plaintiff a duty of ordinary care to ensure his compliance with the requirements of her IEP and to respond to bullying of her in his class.

204.   Defendant Rowe's failure to comply with Plaintiff's IEP and failure to respond to bullying against her violated his duty of care.

205.   As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## COUNT VI
### Negligent Infliction of Emotional Distress
### (Plaintiffs Robinson, Conner, and Williams)

206.   Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

207.   Defendants' failure to conduct appropriate investigations, failure to respond appropriately to reports of Title IX violations, and failure to find responsible or discipline any of the

perpetrators constitutes conduct so reckless as to demonstrate a substantial lack of concern for whether Plaintiff was injured.

208. Defendants failed to conform their conduct to that of a reasonable person.

209. The events described above would naturally and probably result in emotional distress.

210. The events described above caused severe emotional distress to Plaintiff.

211. Defendants were repeatedly notified that their inaction was causing continued severe emotional distress to Plaintiff, and continued with their course of conduct regardless.

212. As a direct and proximate result of Defendants' acts and omissions, Plaintiff has sustained injuries and damages, including, but not limited to, loss of her fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## <u>RELIEF REQUESTED FOR ALL CAUSES OF ACTION</u>

For all the foregoing reasons, Plaintiff prays for judgment against Defendants as follows:

A. For past, present, and future non-economic damages in an amount to be determined at trial;

B. For past, present, and future general, special, incidental, and consequential damages in an amount to be determined at trial;

C. For any appropriate statutory damages;

D. For costs of this suit;

E. For punitive damages, according to proof, as appropriate to the individual cause of action;

F. For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

G. For reasonable attorneys' fees, costs, and interest, to the fullest extent allowed by law; and

H. All such additional and/or further relief as this Court deems just and equitable under the circumstances.

Dated: January 7, 2021

Respectfully Submitted,

*Catherine M. Michael*

_____

Catherine M. Michael 22474-49
Connell Michael Kerr, LLP
550 Congressional Blvd., Suite 115
Carmel, Indiana 46032
Main Line: 317-343-4482
Direct Dial: 317-696-4159
Catherine@cmklawfirm.com
www.cmklawfirm.com

Michelle K. McGuire 36526-49
Connell Michael Kerr, LLP
550 Congressional Blvd., Suite 115
Carmel, Indiana 46032
Main Line: 317-343-4482
Direct Dial: 440-396-7844
Michelle@cmklawfirm.com
www.cmklawfirm.com

*Attorneys for Plaintiffs*